IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:23-cv-02736-SKC-KAS

MAO, INC.,

    Plaintiffs,

V.

PENN ENTERTAINMENT, INC., and
AMERISTAR CASINO BLACK HAWK, LLC,

    Defendants.

---

**ORDER**

---

In 2005, Plaintiff MAO, Inc. (MAO or Plaintiff) and Defendant Ameristar Casino Black Hawk, LLC (Ameristar)[1]—which is a wholly owned subsidiary of Defendant PENN Entertainment, Inc. (PENN)—entered into a licensing agreement whereby Ameristar could operate a minimum of five of MAO's specialized "Streak" blackjack tables at the Ameristar Casino Black Hawk (the Casino). *See* Dkt. 90, ¶¶2, 38.[2] The parties extended the license agreement numerous times and executed a new

---

[1] The original lease was between MAO and Ameristar Casino Black Hawk, Inc. Dkt. 25, ¶90. The corporation converted to a limited liability company in 2016. *Id*. at ¶59.

[2] While this Court already relayed the factual background in its previous Order, it recites them again here based on the allegations (and new paragraph references) in the Second Amended Complaint, which the Court takes as true of purposes of the Motion to Dismiss.

1

agreement in September 2011. *Id*. ¶¶38-40. The 2011 agreement was also extended multiple times. *Id*. The only named parties to the license agreements and addenda extending the same are MAO and Ameristar. *Id*.

In March 2020, during the COVID-19 pandemic, the Colorado Governor ordered all casinos closed to prevent the spread of the virus. Thereafter, PENN allegedly contacted Plaintiff to move the payment terms under the licensing agreement "to approximately 90 days." *Id*. ¶51. PENN also requested any lease fees be held in abeyance until the Casino reopened. *Id*. Neither Ameristar nor PENN made lease payments for June, July, or August 2020. *Id*. ¶52. The Parties ultimately agreed to suspend any payment until table gaming was once again permitted in Colorado. *Id*. ¶54. However, according to the Second Amended Complaint, when table gaming did resume, Defendants failed to make lease payments for September, October, November, or December. *Id*. ¶¶56-57.

In December 2020, PENN made an unsolicited payment to Plaintiff— presumably for the amount in arrears. *Id*. ¶58. Thereafter, the operative license agreement expired on February 28, 2021, and no extending addendum was executed. *Id*. ¶60. Nevertheless, the Casino continued to use and offer Plaintiff's blackjack tables without payment. *Id*. ¶61. The parties' efforts to rectify the matter and enter into a new license agreement were ultimately unfruitful, *id*. ¶¶62-66, and on March 3, 2023, the Vice President and General Manager of the Casino sent Plaintiff a letter stating, "the Agreement between Ameristar Casino Black Hawk Inc. and MAO had

concluded" on February 28, 2023. *Id*. ¶70. PENN then sent Plaintiff a check for $33,600.00, although Plaintiff did not cash it. *Id*.

Plaintiff filed this case on October 19, 2023, solely against PENN (Dkt. 1), which PENN opposed on the basis that it was Ameristar's corporate parent and did not operate the Casino. Dkt. 16. Thereafter, Plaintiff filed an Amended Complaint adding Ameristar as a Defendant and asserting claims against both Defendants under the Lanham Act, the Colorado Consumer Protection Act, and the Colorado Uniform Trade Secrets Act, as well as claims for breach of contract and unfair competition under Colorado common law. Dkt. 25.

This Court granted Defendants' request to dismiss with prejudice Plaintiff's cause of action under the Colorado Consumer Protection Act because the alleged wrongs in this case are private in nature. Dkt. 89. The Court dismissed the remainder of the case under Federal Rule of Civil Procedure 8 because the Amended Complaint was impermissibly group pleaded. *Id*. In particular, the Court noted that Plaintiff repeatedly referred to PENN and Ameristar in the collective as "Defendants" or as "PENN and/or Ameristar." *Id*. p.7. Finally, the Court observed that it was unclear what legal theory—agency or corporate veil piercing—MAO was using to hold a parent company liable for the acts of its subsidiary. *Id*. p.8. The Court gave MAO leave to amend its complaint and address these deficiencies. *Id*.

Plaintiff filed its Second Amended Complaint ("SAC") on July 31, 2026 (Dkt. 90), and Defendants have again filed a Motion to Dismiss arguing Plaintiff has failed

3

to address the pleading deficiencies regarding PENN and has failed to state a claim for violation of trade secrets. Dkt. 91. The matter is fully briefed, and no hearing is necessary. Having considered the SAC, the Motion to Dismiss and related filings, and the controlling law, the Court GRANTS Defendants' Motion.

## A. STANDARD OF REVIEW

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010) (internal citations omitted). But the Court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (cleaned up).

The *Twombly/Iqbal* pleading standard first requires the court to identify which allegations "are not entitled to the assumption of truth" because, for example, they state legal conclusions or merely recite the elements of a claim. *Id.* It next requires the court to assume the truth of the well-pleaded factual allegations "and

4

then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. In this analysis, courts "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). The standard is a liberal one, however, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

## B. ANALYSIS

### 1.    PENN's Liability for Ameristar's Actions

It is beyond dispute that Ameristar is a wholly owned subsidiary of PENN. Dkt. 90, ¶13. And it is "a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns*, LLC, 28 F.4th 996, 1007 (10th Cir. 2022) (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Although a court may pierce the corporate veil, it must be done so "reluctantly and cautiously." *Id.* Under Colorado law, piercing is appropriate where "(1) the corporate entity is an alter ego or mere instrumentality; (2) the corporate form was used to perpetrate a fraud or defeat a rightful claim; and (3) an equitable result would be achieved by disregarding the corporate form." *Martin v. Freeman*, 272 P.3d 1182, 1184 (Colo. App. 2012).

Similarly, "a wholly owned subsidiary may be an agent [of the parent corporation] . . . when its activities as an agent are of such a character as to amount to doing business of the parent." *BASF Corp. v. Willowood*, LLC, 359 F. Supp. 3d 1018, 1026 (D. Colo. 2019). Agency is a manifestation of consent that one person shall act on behalf, and be subject to the control, of another. *Beverly Kuenzle, Wayne Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 459 (10th Cir. 1996) (internal quotation marks and citation omitted). "There can be no agency relationship unless the factual element of control is present." *Id*. This relationship cannot be presumed but must be clearly demonstrated. *Id*.

The difficulty in this case remains that although Plaintiff seeks to hold PENN directly liable for actions taken by its subsidiary, Plaintiff makes no effort to specify the legal theory by which this Court could do so. Like the previous pleading, the SAC contains scattered and scanty allegations regarding PENN's purported control over Casino operations, which hints at veil piercing without ever saying as much. *See e.g.*, Dkt. 90, ¶¶30-32, 42, 48, 58, 64. And in conclusory fashion Plaintiff contends the Court should hold PENN vicariously liable for "the infringing acts of its agent and subsidiary, Ameristar." *Id*. ¶¶119 (Claim Three, Unfair Competition), 126 (Claim Four, Trade Secret). The Court asks once again, which is it? Where Plaintiff did not see fit to identify a legal theory that would provide it with the relief it seeks, Defendants should not be required to defend blindly against the various possibilities.

6

And without specifying a legal theory, any purported facts alleged in support of the theory are unmoored.

Even if Plaintiff's theory was specific, the only allegations suggesting either agency or veil piercing are limited to the following:

- PENN "manages various aspects" of the Casino license agreements (*Id.* ¶¶31, 42, 48)

- PENN's Regional Director of Strategic Sourcing informed MAO that the Casino's table games had been closed (*Id.* ¶56)

- PENN's EVP and CFO informed MAO that payments would be delayed (*Id.* ¶¶48, 51)

- PENN attempted to pay MAO for the license fee arrears (*Id.* ¶¶58, 70)

- PENN's corporate counsel negotiated with MAO for the license renewal (*Id.* ¶64)

These sparce allegations simply do not create a plausible inference that Ameristar was a mere instrumentality or doing the bidding of PENN. Consequently, to the extent Plaintiff seeks to hold PENN directly liable for Ameristar's actions, through veil piercing or vicarious liability for the act of an agent, those claims are dismissed with prejudice because of Plaintiff's repeated failure to cure this issue through the amendments that have been allowed.

### 2.    PENN's Direct Liability

Turning to the alternative claims against PENN, MAO contends PENN is contributorily liable for trademark infringement because PENN enabled Ameristar to infringe on Plaintiff's trademarks. Plaintiff also asserts a claim of tortious interference with contract because PENN allegedly induced or caused Ameristar to breach the license agreements. Neither theory is viable.

### a.  Contributory Trademark Infringement

To state a claim for contributory trademark infringement, Plaintiff must establish "the defendant either (1) intentionally induce[d] a third party to infringe on the plaintiff's mark or (2) enable[d] a third party to infringe on the mark while knowing or having reason to know that the third party [was] infringing, yet fail[ed] to take reasonable remedial measures." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013). Plaintiff acknowledges it has no information regarding whether PENN induced Ameristar to violate MAO's trademarks (Dkt. 98, p.9), and the lacking allegations in the SAC bear that out. Plaintiff has failed to state a claim under the first theory of contributory infringement.

With respect to enablement, "[w]hen the alleged direct infringer supplies a service rather than a product, under the second prong of this test, the court must consider the extent of control exercised by the defendant over the third party's means of infringement." *In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 897 (D. Colo. 2020) (quoting *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir.

2007)). "To 'enable' is to give someone the authority or means to do something." *Mar-K Specialized Mfg., Inc. v. Bed Wood & Parts, LLC*, No. CIV-20-00450-JD, 2020 WL 13280799, at *2 (W.D. Okla. Sept. 22, 2020) (citing Black's Law Dictionary, "Enable" (11th ed. 2019) (defining enable as "[t]o give power to do something; to make able")).

In this case, Ameristar provides gaming opportunities to the public—a service—thus, PENN's liability turns on allegations of its direct control over Ameristar's provision of those gaming services. In the SAC, MAO alleges PENN managed Ameristar's licenses and paid the licensing fees on Ameristar's behalf. Dkt. 90, ¶¶42-43. But as discussed above, none of the allegations in the SAC create a plausible inference that PENN exerted the type of control over its subsidiary that would support a finding that PENN enabled Ameristar's infringement. *See* § B.1., *supra*.

The only allegation in the SAC that suggests enablement is Plaintiff's contention that Defendants procured counterfeit tables in order to continue offering MAO's games. But, with respect to PENN, the allegation is limited to: "Ameristar employees, acting in concert with PENN's procurement division, ordered six (6) counterfeit STREAK® blackjack table layouts from an unlicensed vendor." *Id*. ¶68. But there are no factual allegations to support this contention, and without such particulars, "acted in concert with" is little more than a legal conclusion masquerading as fact.

9

Plaintiff's claim against PENN for contributory trademark infringement is dismissed with prejudice.

### b. Tortious Interference with Contract

Turning to tortious interference with contract, a plaintiff must establish "(1) it had either a valid existing contract with a third party or that it expected to enter into a contract with a third party; (2) Defendants induced or otherwise caused the third party to breach the contract or not enter into the contractual relation; (3) Defendants did so intentionally; and (4) Defendants used improper means." *Bolsa Res., Inc. v. Martin Res., Inc.*, No. 11-cv-01293-MSK-KMT, 2014 WL 4882132, at *8 (D. Colo. Aug. 28, 2014) (citing *Tara Woods Ltd. Partnership v. Fannie Mae*, 731 F.Supp.2d 1103, 1119 (D. Colo. 2010)).

Even accepting for the sake of argument that the allegations in the SAC demonstrate the first three elements of such a claim, there are no allegations regarding the "improper" means PENN purportedly used to either cause Ameristar to breach the license agreement or prevent it from entering into a new agreement. Plaintiff contends that PENN's corporate counsel attempted to negotiate new lease terms with MAO, but the negotiations ultimately were not fruitful. Dkt. 90, ¶¶63-66. Without more, the failure of these negotiations alone does not plausibly suggest PENN used improper means to interfere with MAO's contract with Ameristar. *See Bolsa Res., Inc.*, 2014 WL 4882132, at *9 (citing Restatement (Second) of Torts § 767 cmt. c (1979) ("Threats of physical violence or lawsuits, economic pressure, and

10

misrepresentations qualify as improper inducements to breach contractual or business relationships.").

This claim is also dismissed with prejudice.

### 3.    Misappropriation of Trade Secrets

"Under Colorado law, to prove misappropriation of a trade secret, a plaintiff must show: (i) that he or she possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and (iii) that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993). In its claim for misappropriation of trade secrets, Plaintiff alleges Ameristar misappropriated "MAO's technical information; designs; processes; procedures; improvements; confidential business or financial information; listing of names, addresses, or telephone numbers; and/or other information relating to MAO's business or profession which is secret and of value." Dkt. 90, ¶125. Plaintiff also alleges that certain of its "trade secrets are encompassed by the facilitation, upkeep, and usage of STREAK® casino table games." *Id*. ¶123. Ameristar contends these allegations are insufficient. The Court agrees.

Plaintiff's first allegation is simply a recitation of the statutory definition of a "trade secret," Colo. Rev. Stat. § 7-74-102 (4), and therefore, fails to establish a plausible inference of a trade secret. *See Jin Hee Park Kim v. Mather*, No. 08-cv-02722-REB, 2010 WL 1268047, at *1 (D. Colo. Mar. 29, 2010) ("legal conclusions

11

masquerading as factual conclusions will not suffice to prevent a motion to dismiss"). Plaintiff's second allegation—its trade secrets are "encompassed by the facilitation, upkeep, and usage" of its games"—is little better. This case is based entirely on Ameristar's facilitation, use, and upkeep of Plaintiff's games, and saying as much in reference to trade secrets does not constitute notice pleading such that Ameristar could know what secrets it improperly utilized.

To avoid dismissal, Plaintiff has attached a copy of its response to one of Defendants' interrogatories (Dkt. 98-1) and contends that this discovery contains a detailed description of the relevant trade secrets. Dkt. 98, p.13. But "the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Thus, the Court does not consider this attachment, and because the allegations *in the SAC* do not establish the existence of a trade secret this claim is dismissed without prejudice.[3]

### 4.    Determination of Trade Name Status

In its final "claim," MAO alleges Ameristar Casinos, Inc. (including Ameristar Casino Black Hawk, Inc.) was merged with and into Pinnacle Entertainment, Inc. "and ceased to exist as a separate entity." Dkt. 90, ¶142. It then alleges that Pinnacle converted Ameristar Casino Black Hawk, Inc. into Ameristar Casino Black Hawk,

---

[3] Ameristar also contends that MAO's purported trade secrets are not in fact secret because they are disclosed in the now-expired patents and are readily observable during game play. Dkt. 100, pp. 12-13. But this is an argument better suited for summary judgment.

12

LLC. *Id.*, ¶143. MAO requests that—in the event Ameristar Casino Black Hawk, LLC is not a viable entity—this Court declare Ameristar Casio Black Hawk, LLC to be a trade name for PENN.

Defendants contend this is not a cognizable legal claim (Dkt. 91, p.20), and MAO has not cited any case law or other authority to demonstrate otherwise. Dkt. 98, p.15. To be sure, according to the Secretary of State's website, which this Court takes judicial notice of, Ameristar Casino Black Hawk, LLC is a Colorado Limited Liability Company formed in 2004 and in good standing. *See* Colorado Secretary of State, Business Database, Business ID #20041217988, https://www.sos.state.co.us (last visited April 7, 2026); see also *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009) (taking judicial notice of two federal agency websites); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute.").

This claim is dismissed with prejudice.

\*        \*        \*

For the reasons shared above, IT IS ORDERED as follows:

1.  Defendants' Motion to Dismiss (Dkt. 91) is GRANTED.

2.  Plaintiff's claims against PENN are dismissed in their entirety with prejudice.

13

3.  Plaintiff's request for "Determination of Trade Name Status" is not a cognizable claim and is dismissed with prejudice.

4.  Plaintiff's claim for misappropriation of trade secrets is dismissed without prejudice.

DATED: April 20, 2026.

BY THE COURT:

S. Kato Crews
United States District Judge

14